# EXHIBIT 1

# Ernest P. Chiodo, M.D., J.D., M.P.H., M.S., M.B.A., C.I.H.
## 35770 Harper Avenue
## Clinton Township, Michigan 48035
## Tel. ██████-1761

July 28, 2025

Jennifer L. Beidel, Esq.
jbeidel@dykema.com
██████-0506
Alison A. Furtaw, Esq.
afurtaw@dykema.com
██████-0592
Dykema

Re: United States of America v. Hoau-Yan Wang
    In the United States District Court for the District of Maryland
    Case No.: 8:24-cr-00211

Dear Ms. Beidel and Ms. Furtaw;

You have asked me to provide an opinion in this matter. I have in this report cited from the Reference Manual on Scientific Evidence (3rd Edition) (the "Reference Manual"). This is in order to provide an independent reliable authority to assist in the assessment of my opinion in light of possible opposing expert opinion in this matter.

## THE REFERENCE MANUAL

The Reference Manual is a joint publication of the Federal Judicial Center and the National Research Council. The Federal Judicial Center serves as the educational and research agency for the federal judiciary and is chaired by Chief Justice Roberts of the United States Supreme Court. The National Research Council is the working arm of the United States National Academies, which include the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. As stated in the preface, the purpose of the Reference Manual is to assist judges in managing cases involving complex and scientific and technical evidence by providing authoritative guidance on the principles and methods underlying various scientific disciplines.

**The Reference Manual . . . is formulated to provide the tools for judges to manage cases involving complex scientific and technical evidence. It describes basic principles of major scientific fields from which legal evidence is typically derived and provides examples of cases in which such evidence was used. Authors of the chapters were asked to provide an overview of principles and methods of the science and provide relevant**

**citations . . . . This edition of the manual has also gone through the thorough review process of the National Academy of Sciences.**

The Reference Manual is available free online in PDF format.

My qualifications to render an opinion in this matter are as follows:

## QUALIFICATIONS TO OPINE

My qualifications include a Bachelor of Arts (B.A.) in Health Science from Kalamazoo College, a Medical Degree (M.D.) from Wayne State University School of Medicine, a Juris Doctor (J.D.) from Wayne State University Law School, a Master of Public Health (M.P.H.) from Harvard University School of Public Health, a Master of Science (M.S.) in Biomedical Engineering from Wayne State University, a Master of Science (M.S.) in Threat Response Management (biological, chemical, and radiological defense) from the University of Chicago, a Master of Science (M.S.) in Occupational and Environmental Health Sciences with Specialization in Industrial Toxicology from Wayne State University, a Master of Business Administration (M.B.A.) with a concentration in economics from the University of Chicago, a Master of Science (M.S.) in Evidence Based Health Care (evidence based medicine) from the University of Oxford in the UK, a Master of Science (M.S.) in Experimental and Translational Therapeutics (drug, vaccine, and medical device development) from the University of Oxford, and a Master of Science (M.S.) in Nanotechnology for Medicine and Health Care from the University of Oxford.

I am board certified in the medical specialties of Internal Medicine, Occupational Medicine, and Public Health and General Preventive Medicine. Internal Medicine is the medical specialty focused upon the diagnosis and treatment of diseases in adults including neurological diseases such as Alzheimer's Disease. Public Health and General Preventive Medicine is the medical specialty most focused upon epidemiology and biostatistics. Epidemiology is the discipline involved in the assessment of factors that may improve or harm health. Occupational Medicine is the specialty most focused upon the diagnosis, treatment and prevention of work and environmentally caused diseases. I am also certified in the engineering and public health discipline of industrial hygiene by the American Board of Industrial Hygiene as a Certified Industrial Hygienist (C.I.H.) in the comprehensive practice of industrial hygiene.

I served for many years as an assistant clinical professor of internal medicine, family medicine, and public health at Wayne State University School of Medicine. I have also served as an adjunct assistant professor of industrial hygiene and toxicology at Wayne State University.

I have served as the Medical Director and Manager of Medical and Public Health Services for the City of Detroit and was the chief physician responsible for measures designed to protect the public health of over one million persons living or working in the City of Detroit at the time of my service. This was a position of substantial public responsibility where I had the direct telephone number to the United States White House

in the event that I needed to contact the President (Bill Clinton) due to a public health emergency in Detroit needing the immediate attention of the President.

I have also been elected to full membership in the Society of Toxicology.

I have been honored by the Engineering Hall of Fame of Wayne State University College of Engineering as a Distinguished Biomedical Engineer.

I have received the rare honor of the Distinguished Alumnus Award for 2023 from Wayne State University School of Medicine. Wayne State University started in 1868 as a medical school. Wayne State University School of Medicine is the largest single campus medical school in the United States of America. Tens of thousands of physicians and surgeons have graduated from Wayne State University School of Medicine since 1868. I am only the 135th graduate of Wayne State University School of Medicine to receive the Distinguished Alumnus Award.

## OPINION

I have reviewed Reports 4.1 through 4.18 authored by Paul S. Brookes, Ph.D. ("Dr. Brookes"). In these reports, Dr. Brookes purports to have conducted image analyses that form the basis for his opinion that Hoau-Yan Wang ("Dr. Wang") falsified Western blots included in a Federal grant application submitted to the National Institute of Health ("NIH").

In his reports, Dr. Brookes does not cite any peer-reviewed medical literature to support the assertion that he employed a recognized or validated methodology in forming his opinion that certain Western blots were falsified by Dr. Wang. To my knowledge, Dr. Brookes did not examine the original Western blot films generated by Dr. Wang; rather, it is my understanding that his analysis was limited to reviewing images purported to depict the original Western blots.

Western blotting is a laboratory technique used to detect specific proteins in a mixture by separating them via electrophoresis, transferring them to a membrane, and probing with antibodies specific to the target protein.

To assess whether Dr. Brookes employed a scientifically recognized methodology in support of his opinion that Dr. Wang falsified certain Western blot images submitted in connection with federal NIH grant applications, I conducted a comprehensive review of the peer reviewed literature. This search was performed using the database of the United States National Library of Medicine, the largest and most authoritative repository of peer-reviewed medical journal articles in the world, containing more than 37 million indexed citations dating back to the 19th century.

I conducted this search using the same systematic methodology I was trained to use as part of the Master of Science program in Evidence-Based Health Care at the University of Oxford, which is internationally recognized as a leading institution in the discipline of evidence-based medicine.

Based on this search and analysis, it is my professional opinion that there is no support in the peer-reviewed medical or scientific literature for the proposition that Dr. Brookes utilized a recognized or validated scientific methodology in arriving at his conclusion that Dr Wang falsified the Western blot images submitted for the NIH Federal grant application.

Should Dr. Brookes identify any peer-reviewed medical or scientific literature that he believes corroborates his methodology or conclusions, I would be glad to review and assess such materials.

I have also conducted a targeted search to determine whether the NIH imposes any specific requirements regarding the submission, formatting or presentation of Western blot images in NIH grant applications. Based on that search, there appear to be no NIH guidelines or federal regulations that prescribe a particular format for Western blot image submission or dictate how such images must be presented in grant materials. In the absence of such requirements, there is no legitimate basis for Dr. Brookes to offer any opinion that Dr. Wang falsified Western blot images in any NIH grant application. Any such opinion would be speculative and unsupported by applicable NIH standards or federal guidance.

In this matter, the relevant issue is whether any characteristics of the Western blot images reviewed by Dr. Brookes provide reliable evidence that the images were intentionally falsified beyond any reasonable doubt. Dr. Brookes may identify visual features in the images—purportedly derived from original Western blots—that, in his opinion, suggest falsification. However, if Dr. Brookes intends to offer an opinion that such features are indicative of intentional falsification, it is essential that he has conducted an appropriate evaluation of alternative explanations for those features, such as imaging artifacts resulting from imaging/scanning duplication, digital transfer anomalies, or permissible forms of image enhancement.

The recognized methodology in medical and scientific disciplines for determining the *Specific Cause* of an observed outcome is a differential diagnosis of etiology. As explained in the Reference Manual on Scientific Evidence (3rd Edition) ("Reference Manual") at page 690, a differential diagnosis is described as follows:

> **Differential diagnosis, for example, is an accepted method that a medical expert may employ to offer expert opinion that satisfies *Daubert*. In the legal context, differential diagnosis refers to a technique "in which physician first rules in all scientifically plausible causes of plaintiff's injury, then rules out least plausible causes of injury until the most likely cause remains, thereby reaching conclusion as to whether defendant's product caused injury."**

While the above passage refers to determining the cause of a disease in an individual patient, the underlying methodology—ruling in plausible causes and systematically ruling out alternatives—applies equally in the context of determining whether visual features of Western blot images are the result of intentional falsification. To reliably conclude that

any aspect of a Western blot image constitutes deliberate manipulation rather than an artifact or benign alteration, a scientific expert must engage in this recognized process or differential diagnosis. Without applying such a methodology, any assertion, such as those made by Dr. Brookes, that the images reflect intentional falsification lacks the methodological rigor required to meet established standards for scientific reliability in both the scientific and legal contexts.

The Reference Manual at page 613 further emphasizes the importance of differential diagnosis in the context of determining specific causation:

> **The process of differential diagnosis is undoubtedly important to the question of "specific causation". If other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the "more likely than not" threshold for proving causation may not be met. But, it is important to recognize that a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimination must actually be capable of causing the injury. That is, the expert must "rule in" the suspected cause as well as "rule out" other possible causes. And, of course, expert opinion on this issue of "general causation' must be derived from a scientifically valid methodology.**

Dr. Brookes did not utilize any recognized methodology whereby he considered and systematically excluded alternative explanations for the visual characteristics of the Western blot images. Instead, his opinion that Dr. Wang falsified Western blot images rests solely on his subjective interpretation of supposed image irregularities, unsupported by any citation to peer-reviewed medical or scientific literature.

Moreover, Dr. Brookes' analysis does not include any application of a scientifically accepted method of differential diagnosis to establish "specific causation." In the absence of such a methodology, his opinion amounts to mere ipse dixit—conclusory assertions lacking foundational reliability under *Daubert*.

My complete list of testimony over the past four years and my current curriculum vitae are attached for the Court's reference.

My compensation is this matter is $600 per hour for all services other than testimony time. Testimony time (deposition or trial) is at the rate of $1,200 per hour with a three-hour minimum.

Very truly yours,

Ernest P. Chiodo, M.D., J.D., M.P.H., M.S., M.B.A., C.I.H.