UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HOAU-YAN WANG,<br><br>Defendant. | Criminal Action No. TDC-24-211 |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
FOR PROSECUTORIAL MISCONDUCT**

As courts have long recognized, "[t]he government's role is grander than serving as an advocate solely for conviction; it must be an advocate for the just outcome of a criminal prosecution." *United States v. Blankenship*, 19 F.4th 685, 694 (4th Cir. 2021) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). It is this "fairness that inheres in the fulfillment of the government's *Brady* obligations" to "disclos[e] to the defendant evidence favorable to him." *Id.* Unfortunately, the Government has fallen short of those standards in this case.

Since filing the Indictment well over a year ago, the Government's case has centered on a tenuous theory that its expert, Dr. Paul Brookes, developed a bespoke method for determining beyond a reasonable doubt that Defendant Dr. Hoau-Yan Wang "fabricated and falsified the results of his scientific research" by "manipulating data and images." (Indictment, Doc. 1, ¶ 14(c).) But until now, the Government has failed to reveal that a committee of four tenured professors from the City University of New York ("CUNY" or the "University"), where Dr. Wang was conducting his research, reached a different conclusion than Dr. Brookes. Apparently, those four professors issued a final report clearing Dr. Wang of any research misconduct sometime prior to May 30, 2025, and CUNY adopted that report. (CUNY Letter, **Ex. 1**.)

1

While Dr. Wang still has not seen that final report, what he does know is that a letter summarizing the report was sent on May 30, 2025 to the Department of Health and Human Services' ("HHS") Office of Research Integrity ("ORI"). That letter confirms that CUNY's Research Misconduct Investigation Committee (the "Committee") "did not find that Dr. Wang's actions constituted acts of intentional, knowing, or reckless falsification and/or fabrication"; that the "Investigation has not resulted in" any "finding of research misconduct"; that "no administrative actions against Dr. Wang are completed, pending, or planned"; and that the "University has [] accepted the Committee's findings and determined that . . . for each of the allegations of research misconduct . . . research misconduct did not occur based on the conclusions reached by the Committee in its Final Report[.]" (*Id.* at 2, 17.) While the Government now claims that the CUNY Letter refers back to a previously leaked draft version of the CUNY investigation report that was available to the defense, that leaked report *does not* contain the findings referenced in the CUNY Letter. In fact, the leaked report purports to find "evidence highly suggestive of deliberate scientific misconduct by Dr. Wang for 14 of the 31 allegations." (*See* Draft Report at 1, **Ex. 2**.)

The newly revealed CUNY Letter calls into question the Government's entire case for several reasons. First, it undermines Dr. Brookes' opinions and *Daubert* hearing testimony. Dr. Brookes testified just two weeks ago that he "reported" his finding of research misconduct to CUNY but was wholly unaware of CUNY's conclusion that no such misconduct occurred. (*See* 9/30/25 Hr'g Tr. Excerpts at 103:2-20, **Ex. 3** (noting that Dr. Brookes "found misconduct evidence" and "reported that to . . . the research integrity officer at CUNY" and stating his belief that CUNY's investigation was "still ongoing").) Instead, the record available to Dr. Brookes and Dr. Wang prior to the *Daubert* hearing suggested quite the opposite – that there was evidence

2

highly suggestive of deliberate misconduct. (Draft Report at 1, **Ex. 2**). In other words, the Government's discovery failures obstructed the Court's efforts to find facts at the *Daubert* hearing. In fact, while the Government has produced FBI 302's of witness interviews subsequent to the *Daubert* hearing, none are for Dr. Brookes, so it appears the Government still has not assessed the impact of the CUNY Letter on Dr. Brookes' opinions.

Second, the CUNY Letter calls into question the Government's broader discovery practices in this case and its fulfillment of its duty of candor to the tribunal. The Government knew as early as September 13, 2021 that ORI: (1) had directed CUNY to investigate the allegations against Dr. Wang and to "sequester evidence" regarding those allegations, (2) "works closely with NIH to share relevant information related to research misconduct proceedings," and (3) directed CUNY to "communicate directly with NIH" about the investigation as necessary. (9/13/21 ORI Letter, at 1, 4, 6 **Ex. 4**). And, yet, the Government has refused, and continues to refuse, to ask ORI (or, logically, NIH) for any materials regarding this case. (10/10/25 Gov't Response, **Ex. 5** ("We do not have and have not requested ORI's file related to the Defendant," and we "are not aware whether ORI conducted its own investigation of the Defendant's conduct."))[1]; *see also* 42 C.F.R. §§ 93.305(a), 93.316 (discussing CUNY's responsibility to sequester evidence and submit that evidence to ORI). In fact, the Government's position is that CUNY's finding "that research misconduct did not occur" is not "*Brady* material." (10/10/25 Gov't Response, **Ex. 5**.) Rather than proceed with caution in light of the new revelations that CUNY found that "research

---

[1] The Government produced 238 pages of ORI materials at approximately 10:00 a.m. on October 14, 2025, but those files pertain to two unrelated matters – ORI v. Ariel Fernandez and ORI v. Cristian Kreipke. (10/13/25 Gov't Response, **Ex. 6**.) Given the timing of the pretrial conference in this matter, defense counsel will supplement the record of this motion should its review of those documents alter any of this motion's representations.

3

misconduct did not occur," the Government has doubled down on its "inten[t] to proceed with the prosecution" without obtaining, reviewing, or producing to the defense *any* materials from ORI. (10/13/25 Gov't Response, **Ex. 6** ("[W]e have not requested ORI's investigative files related to Dr. Wang (or any files which may pertain to Dr. Brookes). With respect to your request for correspondence, we will not be producing all correspondence with CUNY or ORI.").) What's more, the Court and defense counsel expressed an interest in ORI's files during the *Daubert* hearing (*see, e.g.,* 9/30/25 Hr'g Tr. at 199, **Ex. 3**), and the Government did not make clear that it was refusing to obtain those files and did not update the Court when it either decided not to obtain those files or learned of the existence of the CUNY Letter.

The Government's investigative efforts with respect to CUNY fare no better. While the Government produced to the defense CUNY files it concedes were "not . . . provided in an organized fashion" (*id.*), the Government repeatedly refused the defense's requests to see the subpoena(s) that yielded those CUNY files so that the defense could make sense of the disorganized files. In fact, the Government finally provided the CUNY subpoenas on October 10, 2025, only after the defense raised the *Brady* issue described in this motion. (CUNY Subpoenas, **Ex. 7.**) As it turns out, the subpoenas to CUNY do not specifically request any documents related to CUNY's investigation of Dr. Wang, but instead request nine unrelated categories of documents. (*See generally id.*) Despite this flaw in the Government's subpoenas to CUNY, which the Government refused to provide the defense until ten days before trial, the Government inexplicably claims to have received and produced what it "understood to be CUNY's investigative files related to Dr. Wang." (10/13/25 Gov't Response, **Ex. 6**.)

The Government has acted contrary to *Brady v. Maryland* by failing to timely produce *Brady* material that is exculpatory and could have been used to impeach the Government's only

4

expert witness at the *Daubert* hearing that has already occurred.  The Government continues to compound that failure by refusing to investigate whether ORI, NIH, or CUNY possess additional potentially exculpatory documents related to the CUNY Letter (or otherwise) and by refusing to obtain Dr. Brookes' opinion on the CUNY Letter.  The Government's failures have caused extreme prejudice to Dr. Wang, who cannot fully investigate the CUNY Letter and its underlying findings for effective use at trial in the short window of time afforded to him and who was hamstrung at the *Daubert* hearing by the inability to cross-examine Dr. Brookes on the CUNY Letter.  Any continuance of the trial would only cause Dr. Wang to incur additional litigation expenses that he can no longer afford after nearly four years of parallel investigations conducted on five different fronts by:  (1) CUNY, ORI, and NIH (which apparently cleared Dr. Wang), (2) the Food and Drug Administration (which did not find intentional misconduct by Dr. Wang), (3) the Securities and Exchange Commission (with whom Dr. Wang reached a resolution in which he did not admit misconduct), (4) the U.S. Attorney's Office for the Southern District of New York (whose investigation target is not Dr. Wang), and (5) the FBI and DOJ in this matter.  It is time for the Government to admit that it cannot prove Dr. Wang's guilt beyond a reasonable doubt and to allow Dr. Wang to move on with his life, but it refuses to do so.  As a result, Dr. Wang respectfully requests that the Court dismiss this case for prosecutorial misconduct or, at minimum, exclude Dr. Brookes' testimony because the Government has not met its burden to show that Dr. Brookes' testimony is reliable in the face of the CUNY Letter.  Should the Court find that this matter should still proceed to trial, Dr. Wang requests that the Court conduct a hearing on the Government's discovery practices, compel production of the entire relevant ORI, CUNY, and NIH files, and provide any other relief the Court deems just and appropriate.

## BACKGROUND

**I.     The Indictment**

Dr. Wang is a neuroscientist educated in the field of pharmacology.  He recently retired from a position as a tenured medical professor of physiology, pharmacology, and neuroscience at CUNY.  (Doc. 1 ¶ 1).  While at CUNY, Dr. Wang "ran a laboratory . . . that conducted scientific research" and obtained federal "grant funding to pay for certain expenses."  (*Id.*)  He also served as an "advisor and consultant" for Cassava Sciences, Inc., f/k/a Pain Therapeutics, Inc. ("Cassava"), a publicly traded biopharmaceutical company, whose work focused on the development of an Alzheimer's drug, and which also secured federal grant funding.  (*Id.* ¶¶ 2-3).

The Government contends that, between 2015 and 2023, Dr. Wang caused grant proposals to be submitted to the U.S. National Institutes of Health ("NIH") that contained "false and fraudulent representations."  (Doc. 1 ¶ 10.)  These allegedly false representations largely stem from a protein detection technique used by Dr. Wang called Western blotting.  (*Id.* ¶ 9).  Western blotting is a visual laboratory technique that allows a trained scientist to detect a specific protein by developing and analyzing a visible "band" on x-ray film.  (*Id.*)  Separate from the visual image of a Western blot "band," the test's results can be quantified using a process called densitometry, which compares the darkness and thickness of various bands to determine the relative protein amounts in each sample.  (*Id.*)

The Indictment accuses Dr. Wang of manipulating images of certain of his Western blots connected to his work with Cassava on behalf of CUNY.  (*See, e.g.*, *id.* ¶ 14(c) (accusing Dr. Wang of "manipulating data and images of Western blots"); *id.* ¶ 18 (citing asserted "false statements and material omissions concerning, among other things, a Western blot . . .").)  As a result, the Government contends that Cassava was awarded approximately $16 million in NIH funding, and

that Dr. Wang "was indirectly paid from these proceeds." (*Id.*)

## II. The Involvement of NIH and ORI as Part of the Prosecution Team

In response to the June 27, 2024 Indictment, Dr. Wang has asserted from the outset that NIH and any other federal agencies involved in the investigation of this matter are part of the prosecution team. (*See* 8/27/24 Discovery Letter, **Ex. 8**.) The NIH is a research agency within the Department of Health and Human Services ("HHS"). Similarly, ORI "oversees and directs Public Health Service (PHS) research integrity activities on behalf of the Secretary of Health and Human Services[.]"[2] *See About ORI*, *available at* https://ori.hhs.gov/about-ori (last visited October 12, 2025.), **Ex. 9**. HHS, in turn, is a Cabinet-level department of the executive branch. And several courts have found that, for purposes of the Government's disclosure requirements under Fed. R. Crim. P. 16(a), "'the government' includes any and all agencies and departments of the Executive Branch of the government and their subdivisions, not just the Justice Department, the FBI, the GSA-OIG, and other law enforcement agencies." *United States v. Safavian*, 233 F.R.D. 12, 14 (D.D.C. 2005) (collecting cases); *United States v. Flynn*, 411 F. Supp. 3d 15, 31 n.6 (D.D.C. 2019) (same).

Consistent with this, discovery produced by the Government shows that ORI was working collaboratively with CUNY on a scientific investigation into Dr. Wang's practices as early as September 13, 2021. (9/13/21 ORI Letter at 1, **Ex. 4**.) As the Government discussed at the *Daubert* hearing, it is typical for ORI to "direct[] the university to go out and conduct an investigation and they would give a lot of input and advice . . . In some instances, ORI does the

---

[2] At the September 30 *Daubert* hearing, the Government indicated that, even after indicting the case and identifying an expert witness, it did not have "a full understanding of what ORI" does. (9/30/25 Hr'g Tr. at 175:11-15, **Ex. 3**.)

investigation themselves if they are not satisfied with what the university did." (9/30/25 Hr'g Tr. at 174:2-9, **Ex. 3**.) According to the CUNY Letter, it appears that ORI delegated the investigation to CUNY, did not disagree with CUNY's findings of no research misconduct, and shared those findings with NIH. (*See* **Ex. 1**.)

At the same time that CUNY was conducting the investigation for ORI and NIH, the prosecution team was discussing its investigation and trial strategy with ORI. The prosecution team contacted ORI as early as April 2023 to inquire about the work of its expert witness, Dr. Brookes. It interviewed ORI investigators and "submitted a little over a dozen of Dr. Brookes' reports to ORI during [its] investigation . . . and they gave some feedback about, frankly, doing some more ORI droplets which is what resulted in the final reports." (9/30/25 Hr'g Tr. at 175:3-10, **Ex. 3**; *id.* at 176:2-6 ("Dr. Brookes, as I understand it, submitted his referral directly to ORI.").) Yet, the Government apparently did not discuss with ORI the results of the investigation ORI delegated to CUNY, has refused to request documents from ORI, and has sent both CUNY and its Research Foundation subpoenas requesting documents relating to Dr. Wang *without* requesting materials relevant to the investigation CUNY was conducting for ORI. (*See* CUNY Subpoenas, **Ex. 7**.)

Although the Government now takes the position that "ORI is not part of the government's prosecution team, including for purposes of discovery," the Government cannot put on blinders as to its own agencies' investigations. The Supreme Court has long recognized that the "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case[.]" *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Higgs v. United States*, 711 F. Supp. 2d 479, 495 (D. Md. 2010) ("The duty of disclosure applies not only to evidence actually known to the trial prosecutor, but also evidence known to those acting on the

Government's behalf."); *United States v. Gupta*, 848 F. Supp. 3d 491, 493 (S.D.N.Y. 2012) ("Where the USAO conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence."). As the Justice Department itself instructs, "[p]rosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes." *See* Department of Justice Manual, § 9-5.002.

### III. Dr. Wang's Discovery Requests.

Consistent with this, Dr. Wang served detailed discovery requests on the Government over a year ago on August 27, 2024. (8/27/24 Discovery Letter, **Ex. 8**.) Among other things, Dr. Wang requested all relevant government agency files; *Brady* materials; and the results of all scientific tests or experiments. (*Id.* ¶¶ 5, 12, 14.) In fact, Dr. Wang specifically noted that "this investigation involved many agencies of the United States," including NIH, and asked that the prosecution team "deem the files of each and every one of these agencies to be within [its] possession, custody, and control." (*Id.* ¶ 14.) The Government apparently refused to do so.

At the September 30, 2025 *Daubert* hearing, defense counsel specifically requested ORI records regarding Dr. Brookes' interactions with ORI, and the Court noted, "I certainly think it would be material to the defense to know that." (9/30/25 Hr'g Tr. at 199, **Ex. 3**.) The Court also expressed interest in other aspects of ORI's records, including the number of reports Dr. Brookes made to ORI, the outcome of those reports, and why ORI was not providing expert testimony in this matter. The Government admitted it could not provide the answer to the first two inquiries and explained that the Government did not have a "full understanding of what ORI did" at the time it retained Dr. Brookes. (*Id.* at 175, 177, 182.) Despite the Court's and defense counsel's focus

9

on ORI's work, the Government still refused to collect files from ORI.  (10/13/25 Gov't Response, **Ex. 6**.)

## IV.     CUNY's Investigation and Reports.

In response, the Government produced approximately two million pages of records, but apparently refused to consider many parallel investigative agencies to be part of the prosecution team.  The Government failed to produce the CUNY Letter until October 7, 2025 – less than two weeks before the trial date – and still has not produced the underlying CUNY reports or any ORI records about those reports.  The CUNY Letter revealed, for the first time to Dr. Wang, that:

1. CUNY's Research Misconduct Investigation Committee (the "Committee") had issued a final investigative report into the allegations of research misconduct.  (CUNY Letter at 1, **Ex 1** ("Since that time, the University has completed this review and provides this substantive update and final conclusions in response to and addressing your letter dated February 2, 2024[.]"));

2. The Committee "did not find that Dr. Wang's actions constituted acts of intentional, knowing, or reckless falsification and/or fabrication."  (*Id.* at 2.)  Indeed, the Committee's "Investigation has not resulted in" any "finding of research misconduct" and "no administrative actions against Dr. Wang are completed, pending, or planned."  (*Id.* at 17); and

3. The "University has [] accepted the Committee's findings and determined that research misconduct did not occur."  (*Id.*; *see also id.* at 2 ("Therefore, for each of the allegations of research misconduct, the University has determined that research misconduct did not occur based on the conclusions reached by the Committee in its Final Report[.]").)

10

## V. The Government's Response

Thus, just weeks before trial, and after previously requesting all *Brady* material, scientific reports, and materials of other federal agencies investigating this matter, the Government produced for the first time the CUNY Letter, which purports to be a summary of CUNY's "final report" that contradicts its expert's conclusions and "determine[s] that research misconduct did not occur." (CUNY Letter at 2, **Ex 1**.) The Government produced the CUNY Letter within a production of 161 documents and did not in any way call the letter to defense counsel's attention or indicate it was *Brady* material. Immediately, Dr. Wang requested additional information from the Government, including:

a. all correspondence between (i) ORI, the FBI, the U.S. Attorney's office, and/or any other member of the prosecution team and (ii) CUNY, members of its Research Misconduct Committee, or any other person or entity discussing CUNY's investigation or reports;

b. all communications and correspondence between (i) ORI and (ii) the FBI, the U.S. Attorney's office, and/or any other member of the prosecution team, regarding this matter;

c. all communications and correspondence between (i) the FBI, the U.S. Attorney's office, and/or any other member of the prosecution team and (ii) any other person or entity that discusses CUNY's investigative report;

d. all reports referenced in the *Brady* letter, including but not limited to the March 25, 2025 Foley Hoag report and the May 26, 2023 CUNY Research Misconduct Committee Final Investigation Report and Final Report Addendum;

e. ORI's complete file regarding this matter, including but limited to discussions of Dr. Wang, Dr. Brookes, Cassava Sciences, and CUNY;

f. any records regarding the U.S. Attorney's office's decision to withhold this critical piece of evidence until the eve of trial;

g. when the U.S. Attorney's office first learned of and received the *Brady* letter and the May 2023 CUNY Committee Report; and

h. whether the U.S. Attorney's office has requested a complete file from ORI regarding the Dr. Wang matter and, if so, when it received it.

(10/9/25 Email, **Ex. 10**.)

The Government declined to produce this additional material, other than to answer that it only learned of the CUNY Letter after the *Daubert* hearing. (10/10/25 Response, **Ex. 5**.) Instead, the Government took the position that CUNY's final conclusion that Dr. Wang did not commit research misconduct is not *Brady* material and that "any conclusions CUNY reached in its letter are not relevant to the government's case because CUNY has never had the materials recovered from the government's search warrant of the Defendant's residence that form the basis of the government's case." (*Id*.) The Government further took the position that ORI is not part of the prosecution team and stated it does "not anticipate any further productions of ORI or CUNY correspondence or communications." (*Id.*) "Accordingly," notwithstanding the formal finding of no research misconduct, the Government confirmed its "inten[t] to proceed with the prosecution" and declined to search for or produce any other information that may be in ORI's possession. (*Id.*)

Based on these egregious discovery lapses, Dr. Wang now moves for dismissal based on prosecutorial misconduct or for such alternative relief as the Court deems just and proper.

## **LEGAL STANDARDS**

In *Brady v. Maryland*, the Supreme Court established that the government's "suppression . . . of evidence favorable to an accused" violates due process. 373 U.S. 83, 87 (1963). "To demonstrate a *Brady* violation, 'the proponent must show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., prejudice must have ensued; and (3) that the prosecution had materials and failed to disclosed them.'" *United States v. George*, 95 F.4th 200, 208 (4th Cir. 2024).

**I.      The CUNY Letter is Favorable to Dr. Wang.**

To start, the CUNY Letter is exculpatory. "Evidence is exculpatory and favorable if it may make the difference between conviction and acquittal had it been disclosed and used effectively." *United States v. Kuehner*, 126 F.4th 319, 330 (4th Cir. 2025) (cleaned up); *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (finding the "evidence favorable to the accused" prong met when the information was "advantageous" to the defendant).

This standard is readily met here. The Government states that "ORI generally does not conduct its own investigations but instead relies on the institutions to conduct their own investigations before reporting their findings back to ORI[.]" (10/10/25 Gov't Response, **Ex. 5**.) Here, CUNY conducted that formal investigation. Its Research Misconduct Investigation Committee—comprised of "tenured faculty actively involved in research in the same field as the Respondent or a related field"[3]—"did not find that Dr. Wang's actions constituted acts of intentional, knowing, or reckless falsification and/or fabrication." (CUNY Letter at 2, **Ex. 1**.) Indeed, the Committee's "Investigation has not resulted in" any "finding of research misconduct" and "no administrative actions against Dr. Wang are completed, pending, or planned." (*Id.* at 17.) Likewise, CUNY itself "accepted the Committee's findings and determined that research misconduct did not occur." (*Id.*)

Put simply, CUNY and its faculty and researchers' conclusion that Dr. Wang did not engage in any research misconduct is certainly "advantageous" and "favorable" to Dr. Wang. It

---

[3] *See* The City University of New York, *Policy Regarding the Disposition of Allegations of Research Misconduct* at § 7.1, **Ex. 11** *available at* https://www.cuny.edu/wp-content/uploads/sites/4/media-assets/Research-Misconduct-Policy-1.24-0224.pdf (last visited Oct. 13, 2025).

can also be used to impeach the credibility of Dr. Brookes, with whom CUNY and its tenured faculty apparently disagree.

## II. The CUNY Letter is Material, and the Government Failed to Timely Disclose It.

As to the second prong of materiality, "the question is whether the favorable evidence, considered collectively, could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *George*, 95 F.4th at 209 (cleaned up); *United States v. Wilson*, 624 F.3d 640, 661 (4th Cir. 2010) ("Evidence is 'material' if it is 'likely to have changed the verdict.'"). When assessing materiality, the "court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case[.]" *Moseley v. Branker*, 550 F.3d 312, 318 (4th Cir. 2008) (citing *United States v. Bagley*, 473 U.S. 667, 683 (1985)).

Relatedly, the third prong looks to whether the Government "had materials and failed to disclose" them. *George*, 95 F.4th at 208. Notably, to satisfy this requirement, the "*Brady* material [must be] disclosed to a defendant in time for its effective use at trial." *United States v. Cabrera-Rivas*, 142 F.4th 199, 218 (4th Cir. 2025); *see also United States v. Pollack*, 534 F.2d 964, 973-74 (D.C. Cir. 1976) ("Disclosure [of *Brady* information] by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure"); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1255 (D.N.M. 2008) (recognizing that "exculpatory evidence will usually require significant pretrial investigation to be useful to a defendant at trial, and thus, disclosure should generally be required well before pure *Giglio* impeachment evidence, which usually does not require substantial time to prepare for its effective use at trial").

Here, the Government's delay in providing the CUNY Letter violates both the second and third prongs. The late disclosure has had a significant adverse effect on "the preparation" of Dr. Wang's case. *Moseley*, 550 F.3d at 318. Dr. Wang's counsel was unable to question Dr. Brookes about the CUNY Letter or its contents at the *Daubert* hearing. And Dr. Wang's counsel has been unable to question members of the Research Misconduct Committee or the author of the CUNY Letter about the Committee's or the University's findings (of which Dr. Wang was unaware until the CUNY Letter was produced), and the availability of any or all of those witnesses for trial remains unknown.[4] While Dr. Wang sent a Rule 17(c) trial subpoena to CUNY earlier in this matter, the Government participated in a hearing in which that subpoena was limited to direct evidence of Dr. Wang's research, and not to the results of the CUNY investigation, so the Government cannot claim it thought the defense would obtain the records at issue directly from CUNY. Dr. Wang's development of his defenses and trial strategy has been significantly hamstrung by this late disclosure, particularly because the CUNY Letter does an about face as to CUNY's position as described in other portions of the Government's discovery materials. (*Compare* CUNY Letter, **Ex. 1** *with* Draft Report, at 1, **Ex. 2** ("The committee has found evidence highly suggestive of deliberate scientific misconduct.").) And, Dr. Wang has nearly exhausted his ability to cover his legal expenses in this case, making any continuance to remedy the Government's failings a significant burden to Dr. Wang.

Worse, the Government continues to take the position that ORI and NIH are not part of the prosecution team and, thus, it is "not aware whether ORI conducted its own investigation" and will not be making "any further productions of ORI or CUNY correspondence or communications."

---

[4] Trial subpoenas for those witnesses and their documents are being submitted contemporaneously with this motion, but those witnesses' availability for trial remains unknown.

15

(10/10/2025 Gov't Response, **Ex. 5**.) In other words, while the limited documents sent by the Government at the last minute support Dr. Wang's defense and conclude that there was no research misconduct and, although there may be other exculpatory documents in ORI or NIH's possession (indeed, it is highly likely that ORI, NIH, and CUNY had other correspondence concerning these findings), the Government is refusing to look for or produce them. Instead, it is proceeding to prosecution without looking into the matter further or providing Dr. Wang with information to which he is entitled, which violate both the Government's duty to advocate for justice and Dr. Wang's due process rights.

### III.    Dismissal is an Appropriate Remedy

Cumulatively, the Government's actions rise to the level of a *Brady* violation. That leaves the question of the appropriate remedy for that violation. "Remedies should be tailored to the injury suffered from the constitutional violation and should not necessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). Although "dismissing an indictment" has been deemed a "drastic step," some courts have "recognized that dismissal with prejudice may be an appropriate remedy for a *Brady* or *Giglio* violation using a court's supervisory powers where prejudice to the defendant results and the prosecutorial misconduct is flagrant." *United States v. Struckman*, 611 F.3d 560, 577 (9th Cir. 2010); *but see United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005) (agreeing with district court's finding that a trial extension is the proper remedy for belated *Brady* disclosures).

As set forth above, the Government's failure to produce the CUNY Letter has infected this entire case and defense. It tainted the *Daubert* hearing because Dr. Brookes' testimony that was based, at least in part, on his referral of the supposed research misconduct issues to CUNY and his view that CUNY had not reached a decision on that referral. It prevented Dr. Wang from

16

investigating the bases for CUNY's decision and ORI and NIH's responses to it.  And, it calls into question whether the Government has, in fact, preserved the evidence that CUNY was required to sequester as part of its investigation.  What's more, the Government's insistence that the CUNY Letter is not *Brady* and its refusal to seek additional files about the letter from ORI, NIH, or CUNY reflects the Government's misunderstanding of its task in this case, which is not to bring home a guilty verdict but to guarantee a just outcome.  A just outcome simply cannot be reached by a prosecution team that refuses to acknowledge that an agency that is a member of the executive branch and that was conducting a parallel investigation could have – and very likely does have – exculpatory information in this matter.

Should the Court instead decide that the case should continue to trial, there are several alternative remedies.  With respect to Dr. Brookes, an appropriate remedy would be to find that the Government has not met its burden to prove that Dr. Brookes' testimony was reliable.  The Government failed to conduct an investigation sufficient to provide Dr. Brookes with relevant information about others' review of Dr. Wang's work prior to the *Daubert* hearing, obstructed the defense's opportunity to cross-examine Dr. Brookes, and failed to provide the CUNY Letter to the Court for its *Daubert* decision-making process.  The result of those failures should be exclusion of Dr. Brookes' testimony as unreliable.  And, while Dr. Wang simply cannot afford a substantial continuance of this matter, a fair resolution requires that the Court conduct a hearing regarding the Government's discovery practices to ensure there have been no additional lapses and require the Government to provide the defense with full relevant files from CUNY, ORI, and NIH.

## CONCLUSION

Given the Government's flagrant refusal to recognize that material like that contained in the CUNY Letter amounts to *Brady,* Dr. Wang's due process rights have been violated, and this

17

Court should dismiss the Indictment against Dr. Wang with prejudice or, at a minimum, exclude the testimony of Dr. Brookes because the Government obstructed the *Daubert* process and failed to meet its burden to prove that Dr. Brookes' testimony is reliable. While Dr. Wang cannot afford a substantial continuance in this matter, should the Court determine that this matter should proceed to trial, Dr. Wang further requests that the Court conduct a hearing regarding the Government's discovery practices, compel production of the entire relevant ORI, NIH, and CUNY files, and grant any other relief the Court deems just and appropriate.

Dated: October 14, 2025

Respectfully submitted,

*/s/ Jennifer L. Beidel*
Jennifer L. Beidel (*Pro Hac Vice*)
Mark Chutkow (*Pro Hac Vice*)
Timothy Caprez (*Pro Hac Vice)*
Emma Blackwood (*Pro Hac Vice*)
DYKEMA GOSSETT PLLC
39577 Woodward Avenue Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
jbeidel@dykema.com
mchutkow@dykema.com
tcaprez@dykema.com
eblackwood@dykema.com

Joanne Zimolzak (19342)
DYKEMA GOSSETT PLLC
1301 K Street NW
Suite 1100 West
Washington, D.C. 20005
(202) 906-8600
jzimolzak@dykema.com

*Counsel for Dr. Hoau-Yan Wang*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of October, 2025, I electronically filed the foregoing MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT and EXHIBITS 1 thru 11 with the Clerk of the Court using the CM/ECF system which will send notification of such filing to those who are currently on the list to receive e-mail notices for this case.

*/s/ Jennifer L. Beidel*
Jennifer L. Beidel

124531.000001 4915-6921-9955.3