UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HOAU-YAN WANG,<br><br>Defendant. | CRIMINAL NO: TDC-24-211 |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT**

The United States of America, by and through its undersigned counsel, hereby files its Response in Opposition to the Defendant's Motion to Dismiss for Prosecutorial Misconduct. *See* ECF No. 118. The Defendant's Motion is premised on a May 30, 2025 letter from the City University of New York ("CUNY") to the U.S. Department of Health and Human Services' ("HHS") Office of Research Integrity ("ORI") (the "CUNY Letter"), which the government first learned about on Friday, October 3, 2025, and produced to the Defendant on Tuesday, October 7, 2025. Despite this, the Defendant seeks the extraordinary remedy of dismissing the Indictment based on the contention that the circumstances surrounding the production of the CUNY Letter constitute a *Brady* violation.

First, this request is unsupported by both the facts and the caselaw, and the Defendant is not entitled to dismissal of the Indictment nor the alternative remedies he proposes, which include the exclusion of Dr. Brookes' testimony, or compelling the production of "the entire relevant ORI, CUNY, and NIH files." As detailed below, the Court should deny the Defendant's Motion because there has been no *Brady* violation—it produced the CUNY Letter two business days after first learning of its existence. Moreover, as far as the government can determine, the CUNY Letter

contains no new facts about the underlying conduct beyond what the government already produced over a year ago.

Second, neither CUNY, ORI, nor NIH are part of the "prosecution team" and, therefore, the government is not required to obtain their files beyond what it has been obtained and has been produced. *See United States v. Taylor*, 942 F.3d 205, 225-226 (4th Cir. 2019).

Third, the requests the Defendant makes of ORI and NIH are not material to the preparation of his defense. Any findings or conclusions from CUNY's investigation are not relevant to the trial in this matter because neither CUNY nor ORI have had the materials recovered from Defendant's residence pursuant to a search warrant that form the basis of the government's case, namely the 'White Box' and 'Raw' images that Dr. Brookes discussed and introduced at the September 30, 2025 *Daubert* hearing.[1] Put differently, the CUNY Letter states that "Because Dr. Wang was unable to provide original data records for any of these allegations, the Committee believed it could not arrive at an objective conclusion regarding whether Dr. Wang falsified and or fabricated data", but the government did recover images and data from the Defendant not available to CUNY that allowed its investigation to reach a different conclusion and it intends to introduce it at trial as evidence against him. *See* ECF No. 118, Ex. 1 at 5. For these reasons outlined below, the Court should deny the Defendant's Motion and the various remedies it seeks.

## BACKGROUND

I. **CUNY's Investigation**

Separate and apart from the government's investigation and after the government's investigation had already begun, ORI contacted CUNY in September 2021 to communicate certain allegations made against the Defendant, after which, CUNY initiated an investigation into the

---

[1] Not including the government's disclosure of a number of Dr. Brookes' reports to ORI for the purpose of assessing his approach, previously discussed at the *Daubert* hearing and in other *Daubert*-related briefing.

Defendant. ECF No. 118, Ex. 2 at 2. In response, CUNY constituted a Research Misconduct Investigation Committee which investigated what ultimately grew to 31 allegations up until May 2023,[2] at which time it issued its final report ("CUNY Final Report") and which included findings discussed in greater detail below.[3] *Id*.; ECF No. 118, Ex. 1 at 3. The CUNY Final Report was publicly leaked in October 2023 and its findings put on hold subject to an investigation into the leak, after which the CUNY Letter was issued in May 2025 adopting the findings of the CUNY Final Report: "the Committee's work concluded in May 2023, and [CUNY] does not believe it should disturb or reevaluate those findings now."[4] *See* ECF No. 118, Ex. 1 at 3.

The government obtained records of CUNY's investigation into the Defendant in 2023, all of which were produced to the Defendant over a year ago. Defense counsel did raise the investigation during her cross-examination of Dr. Brookes at the September 30, 2025 *Daubert* hearing. Dr. Brookes testified that he found misconduct in some of Dr. Wang's materials unrelated to this case and reported that to CUNY, that he knew CUNY ran an investigation, that he believed CUNY's investigation was ongoing, and that he did not know what the results or findings of the investigation were because he believed it was ongoing. ECF No. 118, Ex. 3 at 104. Since the public leak of the CUNY Final Report and CUNY's public statement that the investigation into Dr. Wang was on hold in October 2023, the government learned nothing about CUNY's

---

[2] Only a small number of the 31 allegations relate directly to the grants articles identified in the Indictment.

[3] Indeed, the Defendant and his counsel almost certainly know more about CUNY's investigation because he participated in it, was interviewed by the committee, submitted written responses to the committee to address the allegations under investigation, and was represented by the same lead counsel that represents him in the present matter. Because of the Defendant's direct participation in the CUNY investigation, the CUNY Letter, which merely summarizes and adopts the conclusions of the committee, offers him no new information or revelations.

[4] The CUNY Letter does take issue with the use of an unnecessarily "heightened" evidentiary standard applied by the Research Misconduct Investigation Committee; i.e., the standard applied was too lenient as applied to the misconduct findings. *See* ECF No. 118, Ex. 1 at 3. In either case, the standard used by CUNY has no bearing on the government's case, as discussed below.

3

investigation until October 3, 2025 when it learned and obtained the CUNY Letter (before producing it to the Defendant on October 7, 2025).

## II. ORI

The government first reached out to ORI in March 2023 and was in sporadic contact with ORI through July 2023 in connection with ORI's review of a number of Dr. Brookes' analytical reports that ORI assessed and concluded were good. There was no contact between ORI and the government in this case between July 2023 and February 2025, eight months after the Defendant had been indicted in this case on June 27, 2024. ORI did not participate in interviews or any other investigative steps the government took in this case. Since February 2025 the government has interviewed two ORI witnesses and consulted with ORI on expert witness and *Daubert*-related issues. All of the contact with ORI has been coordinated through HHS counsel.

## III. NIH

The U.S. National Institutes of Health ("NIH") is the victim of the grant fraud scheme alleged in the Indictment. NIH had no role in the government's investigation beyond its victim status. The government's contact with NIH in this case has been limited to requesting and obtaining grant-related documents and interviewing NIH witnesses associated with those grants, all coordinated through NIH's own legal counsel. NIH is an Operating Division within HHS and sits in an entirely different place from ORI within the HHS organizational structure. Typically the only reason for interactions between the two offices is if NIH needs to make a referral to ORI to conduct a misconduct investigation and, after the conclusion of the investigation, ORI's need to communicate its investigative findings back to NIH.

## IV. Requests for Information Beyond the Prosecution Team

In an August 27, 2024 letter, the Defendant requested that the government deem the files of the following entities within the government's possession, custody, or control: "the Department of Justice; various United States Attorneys Offices, including the Southern District of New York, Eastern District of Pennsylvania, and Western District of Texas; the Food and Drug Administration; the National Institutes of Health; the Securities and Exchange Commission; the Financial Industry Regulatory Authority; and the Federal Bureau of Investigation." Ex. 1. With respect to this request, the government responded by letter on September 23, 2024 consistent with an August 28, 2024 call with defense counsel that "the files in the government's possession for purposes of searching for discovery in this case are limited to the U.S. Department of Justice's Criminal Division – Fraud Section, the U.S. Department of Justice's Consumer Protection Branch, the FBI, and the U.S. Food and Drug Administration's Office of Criminal Investigations." Ex. 2. This issue was not raised again until an October 3, 2025 letter requesting the government produce files maintained by ORI and again in an October 9, 2025 letter requesting ORI materials "[b]ecause ORI is part of HHS, which is a federal investigative agency that is closely enough related to this matter to be considered part of the prosecution team." Exs. 3, 4. The government subsequently responded on October 10, 2025 consistent with its September 23, 2024 letter that ORI was not part of the prosecution team. Ex. 5.

**ARGUMENT**

I. **The CUNY Letter is Not Exculpatory**

The Defendant's Motion is predicated on a clear misreading of both the CUNY Letter and the CUNY Final Report and Addendum issued by the Research Misconduct Investigation Committee on May 26, 2023, which was tasked by CUNY to investigate allegations of research misconduct by the Defendant. *First*, the Defendant claims that the CUNY Letter cleared him of

5

misconduct. ECF No. 118 at 1. Not so. Rather than clearing the Defendant of misconduct, the CUNY Letter cites the Defendant's inability to provide original data records as the reason why the committee could not reach a conclusion on whether the Defendant had falsified or fabricated data. Specifically, the CUNY Letter states:

> The Committee attempted to obtain original data records from Dr. Wang to determine if the artifacts or anomalies identified in images and figures could constitute potential falsification and/or fabrication . . . Because Dr. Wang was unable to provide original data records for any of these allegations, the Committee believed it could not arrive at an objective conclusion regarding whether Dr. Wang falsified and/or fabricated data. While the lack of preservation of research records of research records represents a significant departure from accepted practices of the scientific community, the Committee did not find that Dr. Wang's actions constitute acts of intentional, knowing, or reckless falsification and/or fabrication and made this determination based on its understanding of the preponderance of evidence standard.

ECF No. 118, Ex. 1 at 5. Thus, the committee's finding that the Defendant's actions did not constitute intentional, knowing, or reckless falsification and/or fabrication is qualified by and derivative of the fact that the Defendant did not provide the committee with original data to allow the committee to assess the allegations.

This determination is further qualified by CUNY's conclusion that the committee may have applied a heightened evidentiary standard, suggesting that CUNY believed the committee could have found that the Defendant engaged in intentional and deliberate misconduct based on the available evidence, had it used the proper standard. ECF No. 118, Ex. 1 at 5. However, CUNY decided against disturbing or reevaluating the committee's findings despite the possibility the committee applied an incorrect standard of review. *Id*. ("However, while the Committee may have applied a heightened standard of review, the Committee's work concluded in May 2023, and the University does not believe that it should disturb or reevaluate those findings . . .").

6

As laid out above, the clear text of the CUNY Letter does not exonerate or clear the Defendant of misconduct. Instead, it documents that the committee could not conclude whether the Defendant engaged in intentional and deliberate research misconduct because the committee was never provided with original data by the Defendant. The Defendant's selective, self-serving interpretation of the CUNY Letter is belied by its clear text, and the Court should reject the claim that the CUNY Letter exonerates the Defendant of research misconduct.

*Second*, the Defendant tacitly argues that the CUNY Letter abrogates or modifies the CUNY Final Report simply because certain evidence, findings, or conclusions are not expressly discussed in the CUNY Letter but are present in the CUNY Final Report. *See* ECF No. 118 at 2 ("While the Government now claims that the CUNY Letter refers back to a previously leaked draft version of the CUNY investigation report that was available to the defense, that leaked report *does not* contain the findings referenced in the CUNY Letter.") (emphasis in original). Here again, the Defendant misreads the CUNY Letter. As noted above, the CUNY Letter expressly states that it is not disturbing or reevaluating the findings of the committee. ECF No. 118, Ex. 1 at 5. Indeed, when discussing each of the allegations of misconduct the committee investigated, the CUNY Letter adopts the conclusions of the committee and notes CUNY's belief that the committee's findings should not be disturbed or reevaluated. *See id*. at 6-17.

Both the CUNY Letter and the CUNY Final Report are consistent in their discussion of the investigative committee's findings and conclusions. Like the CUNY Letter, the CUNY Final Report does not clear or exonerate the Defendant of scientific misconduct. As the committee notes in the report, the committee "found evidence highly suggestive of deliberate scientific misconduct by Dr. Wang for 14 of the 31 allegations. However, [the committee was] unable to objectively assess the merit of the allegations due to the failure of Dr. Wang to provide underlying, original

data or research records and the low quality of the published images that had to be examined in their place." ECF No. 118, Ex. 2 at 1. The Defendant's insinuation that the CUNY Letter is somehow inconsistent with the CUNY Final Report is unfounded. The CUNY Letter contains neither new findings nor does it abrogate any prior findings by the committee as documented in the CUNY Final Report.

Due to the Defendant's misreading of the CUNY Letter and the CUNY Final Report, the Defendant fails to grasp that the findings and conclusions reached by the committee have no bearing on the government's case. As discussed above, CUNY's investigation was stymied by the Defendant's failure to produce original data, which ultimately precluded the committee from concluding whether the Defendant deliberately falsified or fabricated his scientific research[5]. *See* ECF No. 118, Ex. 1 at 5; ECF No. 118, Ex. 2 at 1. Thus, the committee's conclusion was merely that they lacked sufficient facts and data to reach a conclusion. Conversely, the government's investigation overcame that same impediment, as missing data was recovered from the Defendant's electronic devices pursuant to a search and seizure warrant. As the Court well knows from the September 30, 2025 *Daubert* hearing, the recovered materials—which were not provided to CUNY by the Defendant or the government and consist of whole, uncropped Western blot scans—form the basis of this prosecution. Put simply, the CUNY investigation and the government's investigation are not similarly situated factually, which vitiates the relevance of CUNY's findings to the present matter.

While CUNY's ultimate *findings* are irrelevant to the present matter, the Defendant's *actions* in response to the committee's request for original data may be material and inculpatory.

---

[5] Indeed, the Addendum to the CUNY Final Report states that it was frustrated by the Defendant's "inability to provide even a single datum or notebook in responses to any allegations." Ex. 6. It further stated, **"[b]ut to be clear, the committee concludes that Dr. Wang's inability or unwillingness to provide primary research materials to this investigation represents egregious misconduct."** *Id.* (emphasis in original).

8

The CUNY Letter documents that the Defendant failed to provide original data in relation to the allegations under investigation, which mirrors the Defendant's failure to provide original data to (1) law enforcement after being served a grand jury subpoena for these materials, and (2) scientific journals that requested original data once questions arose about the integrity of the Defendant's research. The reason why the Defendant failed to provide original data to CUNY, to law enforcement, and to scientific journals is simple: the original data would expose his falsification and fabrication of Western blot images. His unwillingness to produce the original data, which was only recovered from him upon execution of a search warrant, is evidence of his consciousness of guilt and was an attempt to conceal his crimes. In sum, the CUNY Letter conveys information that is potentially inculpatory evidence that advances the government's case, not exculpatory evidence that clears him of misconduct. For this and other reasons, the predicate of the Defendant's Motion is fatally flawed.

## II. There is no *Brady* Violation

To prevail on a Brady claim, the defendant must show that "(1) the evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the government, either willfully or inadvertently; and (3) the evidence is material." *United States v. Wolf*, 860 F.3d 175, 193 (4th Cir. 2017) (internal quotation marks omitted). "To be material, there must be a reasonable probability that disclosure of the evidence would have produced a different outcome." *Id*. (internal quotation marks omitted). Defendant has failed to allege a colorable *Brady* violation because the requests he is making for ORI and NIH records are not material to the preparation of his defense, ORI and NIH are not part of the prosecution team, and the government did not fail to disclose the material in its possession.

### A. ORI and NIH are not Members of the Prosecution Team

Even if the requests were material, the Defendant's argument further fails because ORI and NIH are not members of the prosecution team. As outlined above, the government spoke to ORI sporadically during the investigation, at one point, going more than 18 months between contacts, during which time the Defendant was indicted. The most frequent contact was not to assist with the investigation at all, but rather to prepare for the *Daubert* hearing well after the case had been charged. The government has had greater contact with employees at NIH, but that contact has been limited to gathering facts and, given the agency's status as the statutory victim of the offenses, that contact does not render NIH to be members of the prosecution team.

The Supreme Court addressed what is "within the government's possession" in *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), holding that *Brady's* disclosure requirements extend to information "known to the others acting on the government's behalf in the case, including the police." In 2019, in *United States v. Taylor*, the Fourth Circuit applied the standard articulated in *Kyles* and declined to extend the government's *Brady* obligations beyond the agents working on the same case. *See* 942 F.3d at 225-226; *see also United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010). District courts within the Fourth Circuit have interpreted *Taylor* as limiting the scope of the government's discovery obligations under *Brady* and Rule 16 where the material at issue was in the custody of a different government agency. *See United States v. Oman*, No. 18-cr-311, 2022 WL 10128432, *7-9 (W.D.N.C. Oct. 17, 2022) (prosecution is not under a duty "to learn of any favorable evidence known by any government agent") (quoting *Taylor*, 942 F.3d at 225-226); *United States v. Individor*, No. 19-cr-16, 2019 U.S. Dist. LEXIS 219573, *11-13 (W.D. Va. Dec. 23, 2019) ("prosecution is not required to disclose evidence from separate investigations by other law enforcement agencies that are not part of the same investigative team") (quoting *Taylor*, 942 F.3d at 225-226).

Starting with ORI, the agency had almost no involvement with the investigation whatsoever. As more fully outlined above, the government had limited contact with ORI pre-indictment. It consisted of a few emails and calls for the purpose of discussing the government's request that ORI assess Dr. Brookes' analyses. This makes sense, given that the government had engaged Dr. Brookes, meaning that it would not need ORI to conduct overlapping analysis of its case file. As described above, after that initial contact in 2023, the government had virtually no contact with ORI for *more than eighteen months,* until well after the case was charged. Furthermore, that contact was largely centered around preparing for the government's *Daubert* hearing in September, not about the investigation more broadly.

Defendant cites to an out-of-circuit district court case, *United States v. Safavian*, to stand for the proposition that the entire executive branch is a member of the prosecution team. *See* ECF No. 118 at 7 (citing *United States v. Safavian*, 233 F.R.D. 12, 14 (D.D.C. 2005)). However, *Safavian* is not the law in the Fourth Circuit, and even recent cases in the District of Columbia have clarified that the analysis is not that broad.

In *United States v. Trump*, the defense asked that several agencies be deemed part of the prosecution team—the entire Special Counsel's Office; United States Attorney's Office for the District of Columbia; several offices within the Department of Justice, including the Office of the Attorney General, the Office of the Deputy Attorney General, and multiple litigating units within the department; the FBI's Washington Field Office; the United States Secret Service; the Cybersecurity and Infrastructure Security Agency; certain components of the Department of Defense; the Office of the Director of National Intelligence; the Central Intelligence Agency; and the January 6 Select Committee. 753 F. Supp. 3d 17, 44-50 (D.D.C. 2024). The district court rejected this maximalist approach, stating instead that the "court does not view the entirety of [the

government components at issue] as a monolith, and so will deem only certain personnel therein as closely aligned with the prosecution" and said that only some files would be deemed to be in the prosecution's constructive control." *Id.* at 44 (internal quotations omitted).

Specifically, in reference to the Special Counsel's Office, the court found that, while the prosecution team is not just the individuals who are currently working on the matter and could include individuals who previously participated in the investigation, the entire Special Counsel's Office was not immediately part of the prosecution team. *Id.* at 44-45. Generally, the court analyzed the scope of the prosecution team based on participation in the investigation. *See id.* at 44-50. Because the United States Attorney's Office had joined the Special Counsel's investigation and they had created what was essentially a joint database for criminal discovery, the Court found that the search must extend to files in that discovery "specifically regarding Defendant's indicted conduct in this case" but found that the defendant had not made the showing to include other January 6 cases in that search. *Id.* at 46. For other components of the Department of Justice, the Court found that certain members of the Department of Justice Office of Inspector General "participated in this investigation" and therefore were part of the prosecution team, but said that the government need not go further than it already had to produce discovery to the defendant. *Id.* at 47. Namely, it was sufficient that the government had searched the case files of the personnel who are working on the ***investigation*** and "who have worked on it previously." *Id.* (emphasis added).

In this case, ORI did not participate in the government's *investigation*, and it should not be deemed part of the prosecution team. The limited engagement that did occur with respect to Dr. Brookes' analyses and Daubert-related issues does not render the ORI to be a part of the prosecution team.

The same is true of NIH. While NIH employees were more substantively implicated by the investigation, they are victims of the fraud, not investigating members of the prosecution team. This is clearly shown by the fact that NIH employees were interviewed like any other witness— including the Defendant—with an agent present and with an interview report produced summarizing the contents of the interview. The government did not engage with NIH employees informally as it would with members of its prosecution team, it engaged with them as victims of the offense who had factual information pertinent to the investigation and did so through NIH counsel. That engagement does not render the NIH to be a part of the prosecution team any more than it renders the Defendant, who was the subject of more interview reports than any single NIH employee contacted by the prosecution team, a member of the prosecution team.

### B. The Defendant's Requests of ORI and NIH are not Material

Defendant's requests as they relate to the two agencies he claims are part of the prosecution team—ORI and NIH—are immaterial because the evidence he is seeking would not significantly "alter the quantum of proof in his favor." *See United States v. Caro*, 597 F.3d 608, 621 (4th Cir.2010); *see also United States v. George*, 95 F.4th 200, 208 (4th Cir. 2024) ("the nondisclosure must be 'so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (internal quotations omitted)). In order to evaluate this prong, it is necessary to understand the various investigations at issue, and the roles of the various participants.

As more completely outlined above, after allegations that the Defendant had committed research misconduct in connection with his work with Cassava Sciences, Inc., came to light, his employer, CUNY, commenced an investigation following a referral from ORI. The government's understanding is that ORI did not conduct an investigation, because as a matter of practice once ORI evaluates whether an allegation meets the threshold of requiring an investigation, ORI does

13

not conduct that investigation; rather, it directs the institutions who receive federal grant dollars to conduct their own investigation—exactly what CUNY did in the instant case.[6] ORI typically functions to ensure that the investigation is being done properly, follows the correct procedural steps, and performs general oversight. At the conclusion of the institution's investigation, ORI may ask the institution to do additional work, or it may agree with the institution's findings. It is atypical for ORI to conduct an independent investigation, and it does not appear that ORI did so in relation to the Defendant. The involvement of ORI in CUNY's investigation would likely be limited to general oversight, and potentially requests for CUNY to conduct additional investigation.

Put more simply, where an institution has conducted an investigation, ORI would not have relevant investigative material related to the case. That material would be with the institutions—in this case CUNY—that conducted the investigation. ORI would have received the same letter that was produced to the Defendant—the CUNY Letter outlining the final findings of the investigation, and incorporating the previous findings of the committee that investigated the matter.

Defendant's request for material related to CUNY's investigation in ORI's possession is, therefore, not likely to significantly alter the quantum of proof in this matter—because it would be limited to general oversight material and duplicates of what the Defendant already possesses. *See Higgs v. United States*, 711 F.Supp.2d 479, 495 (D. Md. 2010) (finding no automatic *Brady* violation when the defendant could have obtained nearly identical information through the exercise of reasonable diligence).

---

[6] *See* Interview of Anuj Sharma, ORI Scientist Investigator, Ex. 7.

The requests of NIH are even more immaterial. While ORI has some role in overseeing misconduct investigations that institutions are conducting, NIH has virtually no role. Other than making a referral to ORI if they discover misconduct on their own (which is not what initiated ORI's actions here), NIH is left completely in the dark as to the conduct of the investigation into that misconduct. If ORI makes a finding of misconduct, they will report that finding to NIH so that NIH can take the appropriate action. But other than that, NIH or any relevant office within NIH—in this case the National Institute on Aging—has no involvement or insight into an investigation.[7]

The requests Defendant made of ORI and NIH are not likely to produce material that would significantly alter the quantum of proof at trial in the Defendant's favor, and as such the documents sought are immaterial.

### C. The Government did not Fail to Disclose any Material in its Possession

The final prong of *Brady* analysis is whether the government failed to disclose the material in question, and that is simply not the case. In fact, the entire basis of this motion is a document that the government produced to the Defendant—the CUNY letter. Defendant does not dispute that the government did not receive this letter until after the *Daubert* hearing and produced it within a few days of receiving it, instead the Defendant claims that the government should have known about the letter earlier because the letter was in the possession of a separate federal agency, retroactively alleging that ORI was part of the prosecution team for the first time. To the contrary, the government obtained the letter on the exact same day it learned about its existence and produced it to the Defendant promptly thereafter.

---

[7] Even if NIH and ORI were in possession of all of the records related to the CUNY investigation, the requests would still be immaterial for the reasons previously stated in this response in the section discussing the CUNY Letter. As stated in that section, the Defendant has misread the 2025 CUNY Letter. It does not clear him of misconduct, it simply finds that it cannot reach a conclusion, apparently due to his own failure to turn over original data records.

The government has not failed to disclose material to the Defendant, and there has been no *Brady* violation.

### III.     Defendant is Not Entitled to Dismissal or Exclusion of Dr. Brookes' Testimony

Even if Defendant had alleged a colorable *Brady* violation, which he has not, he is not entitled to the remedies he has sought—a dismissal or an exclusion of Dr. Brookes' testimony. In Defendant's own motion, he acknowledges that the Fourth Circuit has found that trial extension, not dismissal, is the proper remedy for belated *Brady* disclosures. *See United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005). Ignoring that controlling caselaw, the Defendant instead opts for an out-of-circuit precedent that recognizes that dismissal "may be an appropriate remedy" but only in cases where the "misconduct is flagrant." *See United States v. Struckman*, 611 F.3d 560, 577 (9th Cir. 2010).

But even under *Struckman*, the facts of that case show that the remedy being sought by the Defendant is entirely inappropriate. In *Struckman*, the government created a fake informant who "provided" crucial information relevant to the government's case, the government attempted to interfere with the IRS audit of a real government witness, and the government lied to a foreign government in order to expedite the removal of the defendant. 611 F.3d at 565-70. Even then, the Ninth Circuit found that this was not the type of flagrant misconduct that required dismissal.

The Defendant cites no case in support of his other suggested remedy—suppression of Dr. Brookes' testimony. Dr. Brookes does not work for CUNY, was not asked to participate in the CUNY investigation, and is not privy to any information about the CUNY investigation that would not be available to any member of the general public—the connection between the Defendant's argument and requested remedy here is essentially non-existent. The idea that Defendant was prejudiced by not being able to ask the witness—at the *Daubert* hearing—about the findings of an

16

investigation he knew nothing about simply does not make sense. That option is still available to the Defendant at trial, where it would arguably have more impact in front of a jury. Furthermore, if the Court was inclined to hear Dr. Brookes' opinions on the CUNY Letter beyond those identified above that he gave at the *Daubert* hearing which clearly suggest he does not have any additional information to provide on this topic, it could simply order a supplemental hearing to pose those questions to him.[8]

None of the Defendant's proposed remedies would be appropriate, even if there had been a *Brady* violation, which is not the case.

## **CONCLUSION**

For the foregoing reasons, the Defendant's motion to dismiss the Indictment for prosecutorial misconduct and requests for alternative relief should be denied in its entirety.

Respectfully submitted,

Lorinda I. Laryea
Acting Chief
Fraud Section, Criminal Division
United States Department of Justice

By: /s/ Andrew Tyler
Andrew Tyler
Vasanth Sridharan
Kashan Pathan
Fraud Section, Criminal Division
United States Department of Justice
*Attorneys for the Government*

---

[8] Defendant also suggested this Court order a discovery hearing, but, in doing so, he does not point to a dispute over *facts* that would require an evidentiary hearing, only the interpretation of those facts. It is undisputed, for example, that the government did not request materials from ORI that the Defendant is seeking. Furthermore, it is undisputed that the government did not receive the 2025 CUNY letter until October. The disputes the Defendant has identified are legal in nature—whether agencies that may have had access to that letter earlier than the government should properly be considered part of the prosecution team, for example. As such, no hearing is required.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

/s/ Andrew Tyler
Andrew Tyler, Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
